## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| | : **Civil Action No.** |
| Plaintiff, | : |
| **v.** | : |
| | : |
| | : |
| **BRENDA A. SMITH, BROAD REACH CAPITAL, LP, BROAD REACH PARTNERS, LLC, and BRISTOL ADVISORS, LLC,** | : |
| | : |
| Defendants. | : |
| | : |

## DECLARATION OF DUSTIN E. RUTA IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER FREEZING ASSETS, GRANTING OTHER RELIEF, AND FOR AN ORDER TO SHOW CAUSE

Kelly L. Gibson
Scott A. Thompson
John V. Donnelly III
Mark R. Sylvester

U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
(215) 597-3100
DonnellyJ@sec.gov
SylvesterM@sec.gov

Dated:   August 26, 2019

I, Dustin E. Ruta, hereby declare as follows:

1.      I am employed as a Staff Accountant in the Enforcement Division of the United States Securities and Exchange Commission (the "Commission") in the Philadelphia Regional Office, located at 1617 JFK Blvd., Suite 520, Philadelphia, Pennsylvania 19103.  My official duties include participating in fact-finding inquiries and investigations to determine whether federal securities laws have been, are presently being, or are about to  be violated, and assisting in the Commission's litigation of enforcement actions.

2.      I received a Bachelor's degree in accounting from Albright College in 2003, a Master's degree in accounting from Villanova University in 2010, and an MBA from Villanova University with a specialization in Finance in 2013.

3.      I am a Certified Public Accountant, licensed in the state of Pennsylvania.

4.      I am assigned to the Commission's investigation in connection with the conduct of Brenda Ann Smith ("Smith"), as well as the entities that she owns or controls, including Broad Reach Capital, LP ("Broad Reach" or the "Fund"), Broad Reach Partners, LLC ("Broad Reach Partners"), and Bristol Advisors, LLC ("Bristol").

5.     I have reviewed, among other things, records for various bank and brokerage accounts, including but not limited to bank records and brokerage records from each of the above entities for any accounts in their name; bank records and brokerage records for numerous other entities owned or controlled, in whole or in part, by Smith; wire transfer records for all of the above accounts; various emails; corporate formation documents; purported financial statements; documents provided by investors; and other documents provided to FINRA or the Commission; as well as publicly available records and information. I also participated in interviews of several individuals, including investors of the Fund.

6.     I make this declaration based on my personal knowledge, information, and/or belief in support of the Commission's Motion for a Temporary Restraining Order Freezing Assets, Appointing a Temporary Receiver, and Granting Other Emergency Relief. My declaration is based upon my review and analysis of the records and information referenced above as well as publicly available information.

7.     My declaration is organized as follows. In Section I, I discuss the relevant individuals and entities. In Section II, I provide background information with regard to the Fund, and summarize various representations made to investors.

2

In Section III, I provide detailed discussions of Defendants' conduct as it relates to

three particular investors (hereinafter referred to individually as "Investor 1;"

"Investor 2;" and "Investor 3" and collectively, the "Investors").  In Section IV, I

discuss Defendants' conduct with regard to the Investors' attempts to redeem their

Fund investments during the spring and summer of 2019.  Finally, in Section V, I

provide some summary level information based on analysis of the movement of

money through Broad Reach bank and brokerage accounts.

## I.   BACKGROUND ON DEFENDANTS AND OTHER RELEVANT ENTITIES

8.   Brenda A. Smith, age 59, is a resident of Philadelphia, PA.  She is the

owner and control person of Bristol and Broad Reach Partners, the general partner

of the Fund, and controls the Fund.  Until recently, Smith owned CV Brokerage,

Inc., a registered broker-dealer, and held Series 7, 24, 27, 53, 63, and 79 licenses.

(*See* Exh. 3, Broad Reach Private Placement Memoranda.)

9.   Smith has extensive international contacts.  She has frequently

travelled internationally and claims to conduct business abroad, including in Hong

Kong, the United Arab Emirates, London, and Curaçao.  Smith has transferred

hundreds of thousands of dollars to bank accounts in the United Kingdom and other foreign jurisdictions.

10.     Smith is the holder of a U.S. passport, as well as a passport from the Commonwealth of Dominica.  (*See* Exh. 1, Smith Dominica Passport.)

11.     On June 14, 2019, Smith submitted, and on July 2, 2019, FINRA accepted, a "Letter of Acceptance, Waiver and Consent" in which Smith agreed to be barred by FINRA in light of her failure to respond to a written request for documents and information issued in connection with "an ongoing FINRA investigation into potential misstatements about the financial performance of an investment fund."  (*See* Exh. 2, Smith AWC to FINRA.)

12.     Bristol Advisors, LLC is a Delaware limited liability company and investment adviser registered with the Commission that purports to provide investment advisory services to its sole client, the Fund.  Smith is the sole owner and control person of Bristol Advisors.  I am not aware of any evidence suggesting that any other individuals make advisory decisions on behalf of Bristol Advisors.  Further, other than advising the Fund, I       am not aware of any known business operations of Bristol Advisors.  (*See* Exh. 3, Broad Reach Private Placement Memoranda.)

4

13.     Broad Reach Capital, LP is a Delaware limited partnership established by Smith in February 2016.  (*See* Exh. 4, May 3, 2018 Letter from Benjamin S. Kaplan.)

14.     Broad Reach Partners, LLC is a Delaware limited liability company and serves as the general partner of the Fund.  Smith is the sole owner and managing member of Broad Reach Partners.  I am not aware of any evidence suggesting that Broad Reach Partners, LLC has any employees nor am I aware of any evidence suggesting that Broad Reach Partners conducts any business other than in its capacity as general partner of the Fund.  Broad Reach Partners, Bristol Advisors, and the Fund all operate out of the same office space in West Conshohocken, PA.  (*See* Exh. 3, Broad Reach Private Placement Memoranda.)

15.     CV International Investments, Ltd. is a purported UK company with its principal place of business in London, UK.  CV International was formed and is controlled by Smith.  (*See* Exh. 5, CV International Certificate of Incorporation.)

## II.   DEFENDANTS REPRESENTATIONS REGARDING THE FUND TO INVESTORS

16.     According to Broad Reach's Private Placement Memoranda ("PPM"), its investment objective and strategy was to "invest its account with managers that

5

represent a diverse set of assets" that would include "equities, bonds, options, commodities, foreign exchange, and energy." (*See* Exh. 3, Broad Reach Private Placement Memoranda.)

17.     In other documents, the Defendants stated that the Fund was to invest in a limited number of trading strategies.  For example, a Broad Reach "Investor Presentation" dated February 2018 made clear that the Fund employed a trading strategy designed to "[i]dentify, utilize, monitor and manage the managers who execute risk strategies through proven mathematical models to generate positive uncorrelated returns."  All of the "[c]ompetitive advantages" of an investment in Broad Reach as identified in the Investor Presentation relate to securities trading. The presentation also provided detailed tables relating to the three of the primary trading strategies:  Dividend Capture, Short-Term Opportunistic Trading, and VIX Convergence (individually, a "Trading Strategy" and collectively, the "Trading Strategies").  (*See* Exh. 19, Feb. 2018 Investor Presentation.)

18.     Investors in the Fund invested by entering into subscription agreements.  (*See* Exh. 6, Investor 2 Fund Subscription Agreement.)

## III.   DEFENDANTS' INTERACTIONS WITH PARTICULAR INVESTORS

A.   <u>Investor 1</u>

19.   Investor 1 invested approximately $9.5 million in the Fund.  (*See* Exh. 43, Mar. 2016 TA 1 Bank Account; Exh. 44, Jun. 2016 Broad Reach Bank Account; Exh. 10, Dec. 2016 Broad Reach Bank Account.)

20.   Smith represented to Investor 1 that his capital would be allocated to the Trading Strategies.

21.   On November 1, 2016, Smith emailed Investor 1 with proposed "terms" for a $5 million investment.  In that email she wrote that "[y]our new contribution would participate in all trading strategies, including the Dividend, VIX, Volatility, Intraday, Long/Short Arbitrage, and other equity and options strategies." (*See* Exh. 7, Nov. 1, 2016 Email from Brenda Smith.)

22.   On December 1, 2016, Investor 1 entered into a side letter agreement with the Fund (as specifically permitted by its PPM).  That side letter stated that Investor 1's investment had been, and would be going forward, allocated to the Trading Strategies and that Investor 1 would be provided with written notice if any material changes in the Trading Strategies were made.  A list of the referenced

7

Trading Strategies was attached to the side letter which Smith signed on behalf of Broad Reach.   (*See* Exh. 8, Dec. 1, 2016 Side Letter Agreement.)

23.    On July 11, 2017, Investor 1 entered into an amended side letter with the Fund that even more clearly defined that to the extent Broad Reach was invested in notes, Investor 1 would be excluded from any gain or loss from those notes.  It also stated that "[e]xcept with regard to the Notes, as of December 1, 2016 the Investors have participated in all of the Investment Strategies of the Fund."  It further defined those strategies as those generally set forth in a document attached to the original December 1, 2016 side letter entitled "Distinctly Different Trading Strategies."  (*See* Exh. 9, Jul. 11, 2017 Amended Side Letter Agreement.)

24.    Smith directly, or indirectly through entities she owned or controlled, transferred only a portion of Investor 1's funds into any brokerage account owned or controlled by the Fund for use in the Trading Strategies.

25.    Between December 19, 2016 and January 23, 2017, the Defendants received over $8.9 million in investor funds into a Broad Reach bank account, as well as a $1 million transfer from another affiliated brokerage account (the TA 1, LLC account), of which $5.6 million was an investment made by Investor 1. However, only $550,000 of this $9.9 million was ever transferred to brokerage

8

accounts for trading.  (*See* Exh. 10, Dec. 2016 Broad Reach Bank Account; Exh. 11, Jan. 2017 Broad Reach Bank Account; Exh. 34, Jan. 2017 Credit The Americas Bank Account.)

26.     Smith used over $8.7 million of capital provided by Fund investors, including Investor 1, for purposes other than the Trading Strategies, which included cash transfers to companies seemingly related to minerals and restaurants.

27.     The accounts/entities that ultimately received the capital referenced in paragraph 26 have no apparent affiliation with Bristol, Broad Reach nor with Broad Reach Partners and a review of bank records does not reflect any investment returns or capital paid back from these entities to any Broad Reach or Broad Reach Partners account.

28.     Furthermore, the accounts/entities that received the capital referenced in paragraph 26 do not appear as "investments" relating to Trading Strategies in the 2016 Financial Statements disseminated to Fund investors (including Investor 1). (*See* Exh. 20, 2016 Broad Reach Capital, LP Financial Statements.)

29.     Additionally, the accounts/entities that received the capital referenced in paragraph 26 do not appear in the June 30, 2019 "asset list" provided to investors.  (*See* Exh. 12, Jun. 30, 2019 Asset List.)

B.    Investor 2

30.    Investor 2 first invested in the Fund in August 2016.  (*See* Exh. 17,

Chart of Investor 2 and 3 Contributions.)

31.    During a September 2016 meeting with Investor 2, Smith wrote down

figures purporting to demonstrate that 100% of Broad Reach's revenue was

derived from the Trading Strategies.  (*See* Exh. 13, Sept. 2016 Handwritten Notes

of Brenda Smith.)

32.    In October 2016, Smith sent Investor 2 a document describing the

uniqueness of the Trading Strategies.  This document described the strategies as

"Distinctly Different" and explained four strategies:  "Dividend Trade"; "Volatility

Skew Trade"; "VIX Options Spread"; and "VXX Trade."  It also listed several

trading-related "competitive advantages," including the Fund's "direct access to

floor brokers on the PHLX" – presumably in reference to the Philadelphia Stock

Exchange.  (*See* Exh. 14, Oct. 11, 2016 Email from Brenda Smith.)

33.    Smith also sent (or directed her employee to send) Investor 2

documents known as "tear sheets" that purported to report Broad Reach's

historically high returns.  For example, both an October 2016 tear sheet and a

March 2018 tear sheet given to Investor 2 included tables reflecting that each

10

month since January 2015 (which predates the origin of the Broad Reach Fund itself by approximately a year) the Fund had positive returns.  (*See* Exh. 15, Oct. 10, 2016 Email from CV Investments; Exh. 16, Apr. 21, 2018 Email from Brenda Smith.)

34.     The March 2018 tear sheet showed 2016 and 2017 annual returns of over 35% and 33%, respectively.  It also stated that the Fund had a positive return of 6.07% in the first three months of 2018, including a 1.76% return for February 2018. (*See* Exh. 16, Apr. 21, 2018 email from Brenda Smith.)

35.     These tear sheets also described the Fund's various Trading Strategies.  In the October 2016 tear sheet, in answering the question "Why Broad Reach", the document explained that it was its "Distinctly Different Trading Strategies" and mentioned its "direct access to floor traders" as well as its "specialized" trades. (*See* Exh. 15, Oct. 10, 2016, Email from CV Investments.) The March 2018 tear sheet made no mention of any investments other than Trading Strategies, and claimed the Fund utilized an "efficient execution platform" and maintained a "high level of liquidity."  (*See* Exh. 16, Apr. 21, 2018 Email from Brenda Smith.)

11

36.     From September 2016 through May 2018, Investor 2 invested over $26.7 million in Broad Reach on behalf of funds and a family partnership he managed. (*See* Exh. 17, Chart of Investor 2 and 3 Contributions.)

37.     Investor 2's capital was routinely used for purposes other than Trading Strategies.  For instance, on July 5, 2017, Investor 2 wired $3 million to a Broad Reach bank account.  Between July 5 and July 7, over $2 million of that capital was transferred to an entity named Investment Consulting, LLC.  (*See* Exh. 18, Jul. 2017 Broad Reach Bank Account.)

38.     Investment Consulting, LLC is an entity owned and controlled by Smith that she has stated is utilized for her own private investments.  (*See* Exh. 21, FINRA Tr. 8/3/2018 at 232; Exh. 4, May 3, 2018 Letter from Benjamin S. Kaplan.)

39.     In May 2018, Investor 2 wired $5.43 million to a Broad Reach bank account, again, with the expectation that the funds would be used in the Fund's Trading Strategies.  However, none of this money was transferred to a brokerage account.  Instead, within weeks, the Defendants used Investor 2's money, along with other investor money, to make payments to other entities Smith controlled as

12

well as to redeem other Broad Reach investors. (*See* Exh. 42, May 2018 Broad

Reach Bank Account; Exh. 22.)

     C.    <u>Investor 3</u>

    40.    Investor 3 created a separate fund to invest in Broad Reach and named

the newly formed fund after one of Broad Reach's Trading Strategies. (*See* Exh.

23, Select Pages of Investor 3 Presentation.)

    41.    Investor 3 first invested $2.285 million in late December 2018 by

transferring the funds to a Broad Reach bank account at a time when the balance in

the account was approximately $949. By January 15, 2019, the Defendants had

exhausted the investments made by Investor 3 but only transferred $31,875 to

brokerage accounts. Instead, Smith transferred, or otherwise directed the transfer

of, approximately $1.37 million to other entities Smith controlled and wired $1

million to a real estate firm. (*See* Exh. 24, Dec. 2018 Broad Reach Bank Account;

Exh. 25 Jan. 2019 Broad Reach Bank Account.)

    42.    On January 29, 2019, Investor 3 invested another $2 million in Broad

Reach, wiring the funds to a Broad Reach bank account at a time when the balance

in the account was approximately $74. That same day the Defendants wired $2

million to another Broad Reach investor who had an outstanding redemption

13

request.  On January 31, 2019, Investor 3 wired an additional $225,000 to a Broad

Reach bank account.  That same day, the Defendants wired the funds obtained

from Investor 3 to the aforementioned Broad Reach investor who had entered a

redemption request.  None of Investor 3's $2.225 million January 2019 Fund

investments were deposited into a brokerage account.  (*See* Exh. 25, Jan. 2019

Broad Reach Bank Account.)

43.     Notes recorded by Investor 3 during a phone call on or about August

30, 2018 with Smith reveal that Smith told Investor 3 that the Broad Reach trader

responsible for the volatility-related Trading Strategy had produced a positive

return in February 2018. Specifically, Investor 3 noted, "[h]e avoided the February

2018 vol shock and he actually went long volatility so he made a huge profit."

Similarly, Smith reported to investors that the Fund was up 1.76% in February

2018, consistent with her claims of positive returns for every month of its

existence.  (*See* Exh. 26, Aug. 30, 2018 Notes of Investor 3; Exh. 16, Apr. 21, 2018

Email from Brenda Smith.)

44.     The Fund's brokerage accounts suffered massive losses in February

2018. In its primary trading account, the Fund lost over 50% of its value –

declining from approximately $17.7 million to approximately $8.8 million (when

14

adjusted for deposits and withdrawals occurring during the month).  (*See* Exh. 27,

Feb. 2018 Broad Reach Brokerage Account; Exh. 28, Feb. 2018 TA 1, LLC

Brokerage Account; Exh. 29, Feb. 2018 Credit the Americas Brokerage Account.)

## IV.   DEFENDANTS' CONDUCT IN RESPONSE TO REDEMPTION REQUESTS

45.    In approximately February 2019, Investor 2 transferred his Broad

Reach investments to Investor 3.  This transfer was approved in writing by Smith

as the authorized representative for the Fund.  (*See* Exh. 30, Transfers Signed by

Smith.)

46.    After the transfer, the purported value of Investor 3's holdings –

according to the books and records of Broad Reach – was approximately $46.6

million, comprised of the transfer from Investor 2, the December 2018 and January

2019 investments made by Investor 3, and purported investment gains from the

Fund's Trading Strategies as reported by Defendants.  (*See* Exh. 31, Investor 3's

Apr. 2019 Broad Reach Statement.)

47.    Of the $46.6 million reflected on Investor 3's April 2019 Broad Reach

statement, approximately $31.2 million was principal.  (*See* Exh. 17, Chart of

Investor 2 and 3 Contributions.)

48.     About three weeks later, Defendants informed Investor 3 that the transfer could result in an involuntary redemption of Investor 3's capital account. In March 2019, Investor 3 decided to fully redeem its $46.6 million Fund investment, which also included Investor 2's capital.  (*See* Exh. 32, Investor 3 Redemption Request.)

49.     Defendants accepted Investor 3's redemption request and stated that the funds would be wired on May 15, 2019.  (*See* Exh. 33, Mar. 28, 2019 Email from Counsel to Brenda Smith.)

50.     Broad Reach did not redeem Investor 3 on May 15, however, and Smith stated various reasons as to why the Fund had not fulfilled the redemption request.

51.     On May 31, 2019, Defendants, still having failed to return Investor 3's investment, instead provided Investor 3 with what Smith claimed to be Broad Reach's "proof of funds" to assure Investor 3 that his capital was "intact." (*See* Exh. 35, May 31, 2019 Letter from Brenda Smith with Corporate Resolution.)

52.     This "proof of funds" was a purported corporate resolution entitled "CV International Investments Limited - Action By Written Consent of the Directors."  The document stated that CV International "is the owner of medium

16

term notes" (*i.e.*, a bond) issued by a major investment bank and that it had

transferred $100 million worth of the bond to Broad Reach, effective December

31, 2017. Smith signed the document as a Director of CV International. (*See* Exh.

35, May 31, 2019 Letter from Brenda Smith with Corporate Resolution.)

53.    Smith has similarly testified that there is a brokerage account in the

name of CV International that custodies $100 million of Broad Reach assets based

on the corporate resolution that she signed. (*See* Exh. 36, FINRA Tr. 5/13/2019 at

131-133.)

54.    Later that same day, Defendants emailed a purported bank statement

to Investor 2 indicating that CV International owned the entire $2.5 billion bond.

(*See* Exh. 37, May 31, 2019 Email from Brenda Smith.)

55.    Defendants provided Investor 3 a one-page document listing the

Fund's purported assets as of June 30, 2019. According to the asset list, the Fund's

assets were valued at over $180 million, with the largest asset being $129.56

million of the bond discussed in paragraph 52. (*See* Exh. 38, Asset List.)

56.    The asset list showed the value of the Fund's brokerage account as

approximately $2.6 million. (*See* Exh. 38, Asset List.) However, the actual June

17

2019 balance of the Fund's brokerage account was approximately $653,000.  (See

Exh. 39, Jun. 2019 Broad Reach Brokerage Account.)

57.     Defendants provided the asset list to other investors in the Fund.

58.     Public records indicate that the entire issuance of the bond discussed

in paragraph 52 was valued at $2.5 billion.  The actual bond is a liquid security that

is actively traded in United States and international bond markets.  Public records

show that there are multiple, large institutional holders of the bond.  (*See* Exh. 40,

Bloomberg Screenshot of Bond Holders.)

59.     I am not aware of any public record indicating that CV International,

Broad Reach, or any other known entity owned or controlled by Smith owns (or

owned) any of the bond, let alone its entire $2.5 billion issuance.

60.     The Fund's second largest asset is "[s]ecuritized cryptocurrency"

purportedly valued at $20.25 million. (*See* Exh. 38, Asset List.)

61.     Defendants provided Investor 3 with a two-page, document entitled

"Wallet," which shows a few lines of text with dollar figures.  (*See* Exh. 41,

Cryptowallet Image.)

18

62.     Bank and brokerage records show no purchases of millions of dollars' worth of cryptocurrency by the Fund and Smith has provided no proof that the Wallet or any account(s) holding cryptocurrency is held by the Fund.

63.     The asset list shows two notes receivable, generically identified as "private holdings" and "real estate holdings," with a purported total value of $12 million.  (*See* Exh. 38, Asset List.)

## V.     SUMMARY STATEMENTS

64.     Overall, a review of bank records indicates that since the Fund's inception, investors have invested approximately $105 million, and approximately $42 million has been returned to those investors.  The Fund still owes investors more than $63 million in principal.

65.     During the relevant period, Smith used Broad Reach funds to pay at least $2 million in American Express credit card bills.

66.     Although approximately $105 million of investor funds were transferred to Broad Reach since its inception, the high point of all brokerage and bank accounts in the name of Broad Reach and its purported affiliates from the Fund's inception to the present date was no more than approximately $31.8 million (December 2016).  Since that time, the total assets within Broad Reach bank and

brokerage accounts have steadily declined, despite the inflow of tens of millions of new investor funds.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief.

Dustin E. Ruta

Dated: August 26th, 2019